1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RANDY SHIELDS,

     Plaintiff,

  v.

FRED MEYER STORES INC,

     Defendant.

CASE NO. 2:23-cv-01455-TL

ORDER ON MOTION TO DISMISS

   This matter is before the Court on Defendant Fred Meyer Stores Inc.'s Motion to Dismiss the First Amended Complaint Under Rule 12(b)(6). Dkt. No. 18. Having considered the relevant record and finding oral argument unnecessary, *see* LCR 7(b)(4), the Court DENIES Fred Meyer Stores Inc.'s Motion to Dismiss.

## I.  BACKGROUND

   The facts alleged in Plaintiff's complaint, which the Court takes as true for the purposes of this Order, are as follows: Plaintiff Randy Shields is a citizen of Washington State and a

customer of Defendant Fred Meyer Stores Inc. ("Fred Meyer"). Dkt. No. 14 ¶¶ 1.1, 2.2. Fred

Meyer is a foreign corporation licensed to do business in Washington State, where it operates a

number of retail stores and gas stations. *See id.* Plaintiff is a Fred Meyer Rewards accountholder.

*Id.* ¶ 2.2. In order to obtain this account, Plaintiff provided Fred Meyer with his name, address,

and telephone number. *Id.*

Since 2018, Plaintiff has received federal Social Security benefits delivered to him via his

Direct Express Debit Mastercard (the "Direct Express Debit Card"). *Id.* ¶ 2.1. Plaintiff has used

the Direct Express Debit Card numerous times since 2018 to purchase gasoline at Fred Meyer.

*Id.* ¶ 2.3. On several of those occasions, Plaintiff prepaid for gasoline by using the Direct Express

Debit Card to purchase a specified dollar amount of gasoline, and then did not pump as much

gasoline as was pre-purchased because the fuel tank on his vehicle became full before all of the

pre-purchased gasoline had been pumped. *Id.* ¶¶ 2.3, 2.5.

On approximately ten occasions starting around December 2018, Plaintiff informed Fred

Meyer's fuel cashier that he had pumped less gas than what he had prepaid for and asked for a

refund. *Id.* ¶ 2.5. Each time, the cashier told Plaintiff that the refund would be automatically

credited back to his Direct Express Debit Card within five business days. *Id.* Based on these

assurances, Plaintiff continued to pump less gas than what he had prepaid for and "rarely"

informed the cashier after March 2020. *Id.* Plaintiff did in fact receive automatic refunds to his

account when using a different debit card, both after informing the cashier and without informing

the cashier of his need for a refund. *Id.* ¶ 2.6.

In November 2022, Plaintiff prepaid with his Direct Express Debit Card for $75.00 worth

of gasoline at Fred Meyer Fuel Outlet #459 and pumped approximately $43.00 worth of

gasoline. *Id.* ¶ 2.7. After several days, Plaintiff had not received his refund and spoke with a Fred

Meyer employee regarding his expected refund, who acknowledged that Plaintiff's Direct

Express Debit Card account had not been credited back for the value of the unpumped gasoline, informed Plaintiff that other customers had complained about failing to receive proper refunds to their debit cards after having prepaid for gasoline and not pumping all of the gas for which they had paid, and ultimately refunded Plaintiff the $32.00 value of the gasoline for which Plaintiff had prepaid but not pumped. *Id.*

Following this incident, Plaintiff requested his previous Direct Express Debit Card statements and discovered that he had only received six refunds for prepaid gasoline which he had not pumped—five in 2019 and one in 2020—none of which were issued after March 2020. *Id.* ¶ 2.8. Plaintiff alleges that there were several occasions after March 2020 when he should have been issued a refund for prepaid gasoline which he did not pump. *Id.*

Plaintiff subsequently discussed this issue with several Fred Meyer employees, including Fred Meyer Senior Manager Brian Lovall. *Id.* ¶ 2.9. Multiple of these Fred Meyer employees reiterated to Plaintiff that other customers had complained to Fred Meyer about failing to receive proper refunds to their debit cards after having prepaid for gasoline and not pumping all of the gas for which they had paid. *Id.* ¶¶ 2.9, 2.10. During his discussion with Mr. Lovall, Plaintiff learned that Fred Meyer's internal records showed there were "additional instances" where Plaintiff had not received refunds for prepaid gasoline that he did not pump. *Id.* ¶ 2.10. These internal records showed that Fred Meyer had attempted to refund Plaintiff's Direct Express Debit Card, but that Direct Express had refused the refunds. *Id.* ¶ 2.11. Mr. Lovall stated that Fred Meyer had no means to contact customers who were owed refunds, despite Plaintiff's status as a Fred Meyer Rewards member. *Id.* Ultimately, Mr. Lovall informed Plaintiff that Fred Meyer store policy prevented him from re-issuing refunds for all but two transactions, as the others had occurred too long ago. *Id.* ¶ 2.10.

1    Following his meeting with Mr. Lovall, Plaintiff met with two additional Fred Meyer

2    employees, who informed him that Fred Meyer's internal records appeared to show that he had

3    been double-charged for gasoline purchase transactions on February 3, 2020, and in December

4    2019. *Id.* ¶¶ 2.12, 2.13. Again, Fred Meyer refused to issue these refunds to Plaintiff, citing a

5    store policy preventing the refund of charges occurring "too far in the past." *Id.* ¶ 2.13. The

6    employees told Plaintiff that if he wished to pursue the matter further, he should sue Fred Meyer.

7    *Id.*

8    Plaintiff then spoke with an employee at Fred Meyer's headquarters who confirmed that

9    Plaintiff had been entitled to refunds that he had not received but that Fred Meyer would not

10   provide the refunds because they occurred too long ago. *Id.* ¶ 2.14. Plaintiff requested he be

11   provided with records of the transactions for which he did not receive credit back to his Direct

12   Express Debit Card or reimbursement for unpumped gasoline or incorrect duplicate charges but

13   was told the employees could not provide either the records or a summary of the records. *Id.*

14   ¶ 2.15.

15   Plaintiff filed the instant action on August 9, 2023, in the Superior Court of the State of

16   Washington for King County. Dkt. No. 1 at 2. Defendant Fred Meyer removed the action to

17   federal court on September 19, 2023. *Id.* Plaintiff brings claims on behalf of himself and two

18   putative classes for conversion, breach of contract, unjust enrichment, violations of the

19   Washington Consumer Protection Act, and imposition of constructive trust. Dkt. No. 14 at 10–

20   19.

21                              **II.    LEGAL STANDARD**

22   A complaint must include "a short and plain statement of the claim showing that the

23   pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may seek dismissal when a

24   plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In

reviewing a FRCP 12(b)(6) motion to dismiss, the Court takes all well-pleaded factual allegations as true and considers whether the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 672. "When reviewing a dismissal pursuant to Rule . . . 12(b)(6), 'we accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiff[ ], the non-moving party.'" *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023) (citing *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). A revised complaint would replace the current complaint. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 925 (9th Cir. 2012) (en banc) ("the general rule is that an amended complaint supersedes the original complaint and renders it without legal effect").

### III.   DISCUSSION

### A.   Plaintiff Has Pleaded Facts Establishing a Claim for Relief

As an initial matter, the Court addresses Defendant's argument that because Plaintiff has not pleaded facts "regarding the date, time, or amount of allegedly unreimbursed transactions," he has not met his burden to plead sufficient factual allegations to nudge a claim from

conceivable to plausible. Dkt. No. 18 at 16; *see also id.* at 15–18. Defendant contends that Plaintiff's reliance on statements from Fred Meyer personnel identifying transactions that allegedly qualify for reimbursement is improper. *Id.* at 16.

But "[t]here is nothing inherently objectionable to pleading on information and belief and doing so is often necessary 'where facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that' gives rise to an inference of plausibility." *Fruci & Assoc's, PS v. A10 Cap. LLC*, 510 F. Supp. 3d 962, 968 (W.D. Wash. 2020) (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). And Plaintiff here has done more than make allegations on information and belief—as Plaintiff points out, he has "pleaded all of the information of which he is currently in possession concerning when he suffered damages and the amount of those damages," including "the potential dates he did not receive the refunds, and the amount he prepaid for gasoline on those dates." Dkt. No. 19 at 16. Plaintiff has alleged that Fred Meyer maintains an internal computer system containing all of the relevant transactions, "including enough information to identify the refunds that could be processed under Fred Meyer's policy and the refunds that were owed but too old to be processed." *Id.* (citing Dkt. No. 14 ¶ 2.11). And perhaps most importantly, Plaintiff has alleged that multiple of Defendant's employees reviewed that internal computer system and informed him that he did not receive all the refunds to which he was entitled, although they would not provide Plaintiff with the information. *Id.*; *see also* Dkt. No. 14 ¶¶ 2.11, 2.14–2.15.

Unlike in *Whitaker v. Tesla Motors, Inc.*, where the Ninth Circuit determined that the plaintiff had not included details regarding particular accessibility issues with the at-issue Tesla service counters, Defendant here is not "in the dark" about Mr. Shields's allegations. 985 F.3d 1173, 1177 (9th Cir. 2021). In *Whitaker*, "[t]he complaint allege[d] that Tesla 'failed to provide accessible service counters,' that Whitaker 'personally encountered' the inaccessible service

counters, and that he was denied 'full and equal access.'" *Id.* The court found that "[t]hese allegations do little more than recite the elements of an ADA claim," and that the complaint failed to answer basic questions such as: "Were the service counters too low? Or too high? Were they positioned in an area that was inaccessible for another reason?" *Id.* In contrast, based upon information provided by Defendant's own employees, Plaintiff here clearly alleges that Fred Meyer maintains an internal computer system containing all of the relevant transactions and information regarding whether Mr. Shields was issued a refund for a transaction and whether that refund was rejected by Direct Express. *See* Dkt. No. 14 ¶ 2.11. He also identifies the dates on which he may have pumped gas for which he did not receive a refund. *Id.* ¶ 2.4.

Contrary to Defendant's assertions, Mr. Shields does not offer "only speculation by Fred Meyer personnel about what his debit card statements show." Dkt. No. 20 at 9. Mr. Shields relies on statements by Defendant's own employees about information tracked on an internal computer system available only to Defendant, which support Plaintiff's own personal knowledge that on several of the dates on which he prepaid for gasoline, he did not pump the full amount of prepaid gasoline and did not receive a refund for the unpumped gas. *See* Dkt. No. 14 ¶ 2.11 ("Mr. Lovall reviewed data in a store computer[] . . . that . . . showed that Fred Meyer had tried to send refunds to Mr. Shields' debit card account but that Direct Express had refused the refunds."). Accepting these facts as true and construing them in the light most favorable to Plaintiff, these allegations are sufficient to plead the existence of damages, and to survive at the motion to dismiss stage. *See, e.g.*, *Underwood v. O'Reilly Auto Parts, Inc.*, No. C21-1766, 2023 WL 8378635, at *3 (D. Nev. Oct. 16, 2023) ("At the pleading stage, a plaintiff is not expected, nor in most cases able to, articulate a claim's precise factual contours that may only later be elicited through discovery."); *Hart v. CF Arcis VII LLC*, No. C17-1932, 2018 WL 3656300, at *6 (W.D.

  
Wash. Aug. 2, 2018) (finding that plaintiffs had alleged sufficient facts to survive motion to dismiss in refund action).

**B.    The Parties' Claim-Specific Arguments**

**1.    Conversion**

"Conversion is the unjustified, willful interference with a chattel which deprives a person entitled to the property of possession." *In re Marriage of Langham & Kolde*, 153 Wn.2d 553, 564, 106 P.3d 212 (2005) (quoting *Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*, 80 Wn. App. 655, 674–75, 910 P.2d 1308 (Wash. Ct. App. 1996), *review denied*, 130 Wn.2d 1015, 928 P.2d 416 (1996)). "Money may become the subject of conversion, but only if the party charged with conversion wrongfully received the money, or if that party had an obligation to return the money to the party claiming it." *Consulting Overseas Mgmt. Ltd. v. Shtikel*, 105 Wn. App. 80, 83, 18 P.3d 1144 (Wash. Ct. App. 2001) (citing *Pub. Util. Dist. No. 1 of Lewis Cnty. v. Washington Pub. Power Supply Sys.*, 104 Wn. 2d 353, 378, 705 P.32d 1195 (1985), *modified*, 713 P.2d 1109 (1986); *see also Steichen v. 1223 Spring St. Owners Ass'n*, 28 Wn. App. 2d 1039, 2023 WL 6973845, at *15 (Wash. Ct. App. 2023) ("money may become the subject of conversion").

Defendant argues that Fred Meyer did not wrongfully receive any money, "because Mr. Shields pleads he chose to pay Fred Meyer to purchase gas in the exact amount Fred Meyer received." Dkt. No. 18 at 19. But as the *Steichen* case cited by Defendant notes, if funds are taken from a person's bank account, those funds can be considered converted once "the owner [of the funds] makes a demand for the return of the property and that demand is refused." *Steichen*, 2023 WL 6973845, at *17. Plaintiff here made a demand for the return of the cost of unpumped gas, which Defendant refused. *See* Dkt. No. 14 ¶¶ 2.7–2.14. Further, the plaintiff in *Steichen* was notified several times that the contested funds would be withdrawn. *Steichen*, 2023

1    WL 6973845, at *16. To the contrary, here Mr. Shields alleges that he was told on several

2    occasions that he would receive a refund for unpumped gas. Dkt. No. 14 ¶¶ 2.5–2.6. In addition,

3    the Court finds that there is a question of fact as to whether Defendant had an obligation to return

4    the money which is inappropriate for resolution on a motion to dismiss. *See infra* Sections

5    III.B.2.a.–b.

6           Defendant also asserts that Plaintiff has not alleged specific facts identifying any specific

7    transactions for which he did not receive a refund. Dkt. No. 18 at 19; Dkt. No. 20 at 10. As the

8    Court has already determined, at this stage of the case, Plaintiff has pleaded sufficient factual

9    allegations regarding the transactions and specifically pleaded that the information is both known

10   to and within the exclusive possession of the Defendant. *See supra* Section III.A. Nor do any of

11   the cases cited to by Defendant doom his claim for conversion. In *Lemelson v. Wells Fargo*

12   *Bank, N.A.*, the court held that "*bank accounts generally* cannot be the subject of conversion"

13   where plaintiff had alleged that Wells Fargo had "wrongly interfered with Plaintiffs' ownership

14   of their deposited funds by (1) refusing to close the accounts upon Plaintiffs' instruction;

15   (2) retaining Plaintiffs' deposited funds after being directed to close the accounts; and

16   (3) disbursing [the funds] to third parties without Plaintiffs' authorization." 641 F. Supp. 3d

17   1005, 1015 (W.D. Wash. 2022) (emphasis added) (internal quotations omitted). But here,

18   Plaintiff's claim for conversion is based on specific monetary exchanges with Defendant that are

19   "identifiable by date and amount." Dkt. No. 19 at 18. *Lemelson*, which dealt with the plaintiffs'

20   bank account generally, is thus distinguishable. Plaintiff has plausibly stated a claim for

21   conversion.

22          Finally, Defendant's conversion argument focuses exclusively on Plaintiff's claim

23   regarding unpumped gas. *See* Dkt. No. 18 at 18–19; Dkt. No. 20 at 10–11. But Plaintiff also

24   alleges that he was informed by Defendant's employees that he was double-charged for gas

purchases on at least two specific occasions (*i.e.*, December 6, 2019, and February 3, 2020), and he requested—but was denied—a refund. Dkt. No. 14 ¶¶ 2.12, 2.13. Defendants fail to address the allegations of conversion related to the double-charging in either their motion or reply. *See* Dkt. No. 18 at 18–19; Dkt. No. 20 at 10–11. Plaintiff's conversion claim would survive based on the double-charges alone at this stage of the case.

### 2.    Breach of Contract

To plead a claim for breach of contract, Plaintiff must allege "(1) the existence of a contract, (2) a material breach of that contract, and (3) resulting damage." *Dreamscapes Landscape & Design, LLC v. Bell's Machine Shop Ltd.*, 588 F. Supp. 3d 1157, 1161 (W.D. Wash. 2022) (citing *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995)).

Uniform Commercial Code ("UCC") Article 2 governs contracts for the sale of goods, such as gasoline. RCW 62A.2-102. Under the UCC, a contract is defined as "the total legal obligation that results from the parties' agreement as determined by this title as supplemented by any other applicable laws." RCW 62A.1-201(12). The parties' agreement is "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade . . . ." RCW 62A.1-201(3). Thus, course of dealing and usage of trade "are relevant not only to the interpretation of express contract terms but may also themselves constitute contract terms." 1 White, Summers, & Hillman, Uniform Commercial Code § 4:3 (6th ed. 2023); *see also Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 146 Wn.2d 428, 434, 47 P.3d 940 (2002) ("[t]rade usage and course of dealing are relevant to interpreting a contract and determining the contract's terms").

Defendant argues that "although [it] may (and often freely does) provide refunds to customers who fail to accept all the fuel they purchase," Plaintiff and other customers are not

entitled to such refunds under the UCC. Dkt. No. 18 at 11. Plaintiff contends that industry custom, usage of trade, and course of dealing establish his right to receive a refund for unpumped gasoline. Dkt. No. 19 at 8–9. Plaintiff argues that his contractual agreement with Defendant for the sale of gasoline, as inferred from the Parties' course of performance and the usage of trade, expressly included a right to refund for the cost of unpumped gasoline. Dkt. No. 19 at 8.

### a.   *Course of Dealing*

Plaintiff first argues that he has pleaded a course of dealing with Defendant that establishes his right to a refund for unpumped gasoline. Dkt. No. 19 at 7–17. Plaintiff contends:

> [His] right to receive a refund was a term of each agreement
> between him and Fred Meyer, as evidenced by the fuel cashiers'
> repeated, explicit assurances to Mr. Shields that he would
> automatically receive a refund to his card for the unpumped
> prepaid gas; Fred Meyer's consistent refunds for unpumped
> prepaid gas to the Shields' second debit card; Fred Meyer's
> provision of such refunds to the Direct Express card for unpumped
> prepaid gas through March 3, 2020; and other factors.

Dkt. No. 19 at 9; *see also* Dkt. No. 14 ¶ 2.5. Defendant argues that the "alleged conversations [between Plaintiff and Fred Meyer cashiers] indicated only that Fred Meyer would attempt to credit [Plaintiff's] bank account for abandoned prepaid gas, not that Fred Meyer would alert consumers if their bank refused to accept such credits." Dkt. No. 20 at 6.

A "course of dealing" under the UCC is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." RCW 62A.1-303(b). "Course of dealing may become part of an agreement either by explicit provision or by tacit recognition, or it may guide the court in supplying an omitted term." *Puget Sound Fin.*, 146 Wn.2d at 436. "An inference of the parties' common knowledge or

1    understanding that is based upon a prior course of dealing is a question of fact." *In re CFLC*, 166

2    F.3d 1012, 1017 (9th Cir. 1999).

3            "Course of dealing analysis requires a determination whether there exists 'an indication

4    of the common knowledge and understanding of the parties.'" *Id.* (quoting *New Moon Shipping*

5    *Co., Ltd. v. Man B&W Diesel, Ag*, 121 F.3d 24, 31 (2d Cir. 1997)). Plaintiff has alleged that on

6    multiple occasions, Fred Meyer fuel cashiers "informed Mr. Shields that the value of the

7    unpumped gasoline would automatically be refunded to his debit card within five business days"

8    of the transaction. Dkt. No. 14 ¶ 2.5. Plaintiff has also alleged that he received refunds for

9    unpumped gasoline even on occasions where he did not alert the cashier that he did not pump all

10   of the gas for which he had prepaid. *Id.* ¶ 2.6 ("Of those sixteen purchases for which refunds

11   were credited back to their MetaBank Visa card, Plaintiff or his wife informed the fuel cashier no

12   more than two times they had pumped less gas than the amount for which they had prepaid and

13   therefore needed a refund."). Further, Plaintiff alleges, and Fred Meyer admits, that Fred Meyer

14   attempted to refund him for the cost of the unpumped gasoline for the disputed transactions,

15   further supporting an inference that both Parties understood that Plaintiff was entitled to a refund

16   for unpumped gasoline. Dkt. No. 14 ¶ 2.11; *see also* Dkt. No. 20 at 7. In the absence of a written

17   contract specifying whether Fred Meyer would provide refunds for the value of unpumped

18   gasoline, Fred Meyer's repeated assertions that it would automatically issue refunds for the value

19   of unpumped gasoline (*see* Dkt. No. 14 ¶ 2.5)—and actual refunds to that effect (*see id.* ¶¶ 2.7,

20   2.11)—are sufficient to establish a common knowledge and understanding of the parties that

21   Plaintiff would be automatically refunded for the cost of unpumped gasoline. *See Puget Sound*

22   *Fin.*, 146 Wn.2d at 436 (finding a course of dealing established after multiple transactions).

23           Defendant argues that a holding that Plaintiff was entitled to a refund for unpumped

24   gasoline would "inject a new, un-assented to refund obligation into the parties' contracts." Dkt.

No. 20 at 6; *see also id.* at 7–8. However, the cases to which Defendant cites in support of its contention that a refund obligation would be a "new" obligation in the parties' contract address the use of course of dealing to interpret terms of written agreements, rather than using the course of dealing to define the contours of the parties' agreement in fact. *See Badgett v. Sec. State Bank*, 116 Wn.2d 563, 572, 807 P.2d 356 (1991) ("The Bank and the Badgetts entered into a written loan agreement."); *In re CFLC*, 166 F.3d at 1014 ("Expeditors billed Everex on Expeditors' regular invoices, issued contemporaneously with receipt of the shipments. From August 1991 until January 1993, Expeditors sent approximately 330 invoices that contained fine print on the reverse side entitled 'Terms and Conditions of Service.'"); *Hitachi Elec. Devices (USA), Inc. v. Platinum Techs., Inc.*, 366 S.C. 163 (2005) ("The sales contract contained a warranty of performance, but the contract also provided for a particular remedy in the event of a breach of that warranty . . ."); *see also* 1 WHITE, SUMMERS, & HILLMAN, UNIFORM COMMERCIAL CODE § 4:3 (6th ed. 2023) (noting that course of dealing may constitute contract terms). Further, as Defendant states, course of dealing may supplement an agreement where the parties' previous dealings "indicate the parties previously agreed on a specific issue that is now in dispute" (Dkt. No. 20 at 6)—as here, where the parties previously agreed that Mr. Shields was entitled to a refund for unpumped gas (as evidenced by Fred Meyer's repeated issuances of refunds to Mr. Shields for unpumped gas), but now dispute whether Mr. Shields is entitled to a refund for the same.

Defendant also argues that Plaintiff "cannot establish any common understanding between him and Fred Meyer regarding any receipt of credits at the time of any of the allegedly unrefunded prepaid gas purchases" because Plaintiff "admits he did not know he received any credits on his Direct Express card until ***November 2022***, years after the transactions at issue," and therefore "could not have relied on the receipt of credits when he continued to purchase gas

from Fred Meyer." Dkt. No. 20 at 8 (emphasis in original). But the cases that Defendant relies on for its assertion address instances where the party invoking the course of dealing undertook a course of action without the knowledge or consent of the other party—the inverse of the situation underlying the instant action. *See Am. Web, Inc. v. Flom Corp.*, No. C11-2444, 2013 WL 5200588, at *4 (D. Colo. Sept. 12, 2013) ("Am Web was not aware that Flom was improperly retaining commission on wastepaper sales. Thus, Flom cannot properly assert that such behavior was a course of performance or dealing with Am Web."). Here, Mr. Shields relied on the repeated representations of Defendant's own employees that he would be refunded for the cost of unpumped gas. His understanding is underscored by the fact that he received automatic refunds to his account when using a different debit card without informing a cashier of the need for a refund. Supporting his belief, he alleges in his complaint that an employee at Defendant's headquarters confirmed that he had been entitled to receive refunds for the unpumped gas. Therefore, that he did not confirm that those representations were correct until several years after the transactions at issue is of no consequence for the analysis of the claim at the motion to dismiss stage.

Accepting these facts and construing them in the light most favorable to the non-moving party, Plaintiff has plausibly alleged a course of dealing which entitles him to a refund for the cost of unpumped gasoline sufficient to survive a motion to dismiss.

### b.      *Usage of Trade*

Plaintiff next argues that usage of trade additionally provides him with a right to receive a refund for the cost of unpumped gasoline. Dkt. No. 18 at 10. Defendant contends that Plaintiff's cited cases do not support his theory regarding an industry practice. Dkt. No. 20 at 8.

"Usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed

with respect to the transaction in question." RCW 62A.1-303(c). In other words, it is "a practice

observed so regularly in an industry that contracting parties expect that it will be followed in the

transaction in question." *Graaf v. Bakker Bros. of Idaho, Inc.*, 85 Wn. App. 814, 818, 934 P.2d

1228 (Wash. Ct. App. 1997). The existence and scope of a usage of trade is an issue of fact. *Id.*

      Plaintiff argues that "[i]t is normal custom in the United States that when customers at a

self-pump gas station do not pump all their prepaid gas, they receive a refund for the unpumped

gas," and cites to two cases in support of this proposition. Dkt. No. 19 at 10–11. In *Palma v. BP

Prods. North Am., Inc.*, 347 Fed. Appx. 526, 527 (11th Cir. 2009), the court noted that

"[plaintiff] returned to the store to collect his change" after prepaying for gas and then failing to

pump the entire amount for which he prepaid. In *Williams v. Anderson*, No. C12-0574, 2012 WL

5928644, at *1 (E.D. Va. Nov. 26, 2012), the plaintiff prepaid for gasoline and when he returned

to the store to alert the cashier of a nonoperational gas pump, was told "you already pumped your

gas . . . here is your change." Defendant argues that because these cases involve parties who

immediately retuned to the store to request a refund, they cannot support Plaintiff's usage of

trade argument. Dkt. No. 20 at 8.

      However, these cases, along with Plaintiff's allegations (which include the allegation that

he did immediately return to Fred Meyer to request a refund for unpumped gas, and was told by

Defendant's employees that he did not need to do so), present a question of fact as to whether it

is a regular practice in the United States to provide refunds for unpumped gasoline when a

customer prepays for gas. This is sufficient for Plaintiff's claims to survive at the motion to

dismiss stage. *See, e.g.*, *Pierce v. NovaStar Mortg., Inc.*, 422 F. Supp. 2d 1230, 1235 (W.D.

Wash. 2006) (finding that defendant's motion presented questions of fact that were not

appropriate to resolve at motion to dismiss stage).

1

          **c.**     ***Whether the UCC Otherwise Precludes Claims for Refund***

2

       Defendant primarily relies on *Lige Dickson Co. v. Union Oil Co. of Calif.*, 96 Wn.2d 291,

3

635 P.2d 103 (1981) for the proposition that the UCC affirmatively precludes Plaintiff's claims

4

for refund. Dkt. No. 18 at 13–15. In *Lige*, the defendant had allegedly breached an oral contract

5

that the statute of frauds had rendered unenforceable. 96 Wn.2d at 299. There, the Washington

6

State Supreme Court held that promissory estoppel could not be used to overcome the statute of

7

frauds in a case involving the sale of goods. *Id.*

8

       The Court reasoned that adoption of Section 217A of the Restatement (Second) of

9

Contracts, which "authorizes enforcement of a promise which induced action or forbearance by a

10

promise notwithstanding the statute of frauds," would necessarily result in increased litigation

11

and confusion. *Id.* at 300. But the statute of frauds provides that "a contract for the sale of goods

12

for the price of $500 or more is not enforceable by way of action or defense unless there is a

13

record sufficient to indicate that a contract for sale has been made between the parties and signed

14

by the party against whom enforcement is sought or by the party's authorized agent or broker."

15

RCW 62A.2-201. In *Lige*, the contract at issue was for the sale and purchase of liquid asphalt

16

and for more than $500—thus squarely falling under the statute of frauds. *See* 96 Wn.2d at 292–

17

93.

18

       In contrast, here the Parties' contract for the sale of gasoline here is subject to neither the

19

statute of frauds nor its restrictions. None of the contracts for the sale of gasoline exceed $500

20

(*see* Dkt. No. 14 ¶ 2.4), as is required for the statute of frauds to apply. RCW 62A.2-201; *see*

21

*also, e.g.*, *Costco Wholesale Corp. v. World Wide Licensing Corp.*, 78 Wn. App. 637, 643, 898

22

P.2d 347 (Wash. Ct. App. 1995) (enforcing statute of frauds where contract as modified involved

23

a sale of goods for more than $500). Thus, this case does not trigger any of the concerns raised

24

regarding adopting an exception to the statute of frauds.

1    The other cases cited by Defendant in support of its assertion that the Western District of

2    Washington and other courts have previously found after-the-fact claims for refunds preempted

3    by the UCC are similarly unpersuasive. For example, Defendant points to *Talon Grp., LLC v.*

4    *Chilean Seafood Exch., Inc.*, No. C06-0393, 2006 WL 3761365 (W.D. Wash. Dec. 21, 2006), for

5    the proposition that UCC Article 2 "preempts any common law claims for setoff or recoupment."

6    Dkt. No. 18 at 15 (quoting *Talon Grp.*, 2006 WL 3761365, at *3). But *Talon Group* addressed a

7    question on summary judgment (rather than on a motion to dismiss) of whether "the amount

8    Defendant owes [under a contract for the purchase of salmon products] should be subtracted

9    from the damages it seeks under the counterclaim under the doctrine of setoff or recoupment."

10   2006 WL 3761365, at *1. In *Talon Group*, the parties did not dispute the existence or the terms

11   of either of the two contracts at issue—in fact, the court noted that "there is no genuine issue of

12   material fact as to whether Defendant owes $381,357.75 for Plaintiff's claim." *Id.* at *2. Here,

13   Plaintiff presents a question of fact as to the terms of the Parties' contracts for prepaid gasoline—

14   *Talon Group* is thus uninstructive given the facts presented in this case. *Prudential-Bache*

15   *Securities, Inc. v. Citibank, N.A.*, addressed whether common law claims could be brought in a

16   fraud case where recovery under the UCC was expressly precluded by UCC 3-405(1)(c), and

17   where the common-law rule in the state before enactment of the UCC precluded recovery by the

18   plaintiff. 73 N.Y.2d 263, 266–67 (N.Y. Ct. App. 1989). Defendant has not pointed to any

19   specific provision of the UCC expressly precluding recovery by Plaintiff nor shown any related

20   common-law rule precluding recovery. Thus, the Court is similarly unpersuaded by *Prudential-*

21   *Bache*.[1]

22

23   _____

[1] Plaintiff additionally argues that because "Fred Meyer advertised its per gallon price for the sale of gasoline on its large, publicly visible signs" (Dkt. No. 19 at 12 (citing Dkt. No. 14 ¶ 4.2)), by refusing to refund the value of the unpumped gas, Fred Meyer breached its contracts to sell gas to Plaintiff at the agreed price (Dkt. No. 19 at 13). This

24   makes the right to a refund for any unpumped gas an integral part of the contract, according to Plaintiff. Dkt. No. 19

1

       3.      **Unjust Enrichment**

2

       To plead a claim for unjust enrichment under Washington law, Plaintiff must allege "(a) a

3 benefit conferred on the defendant by the plaintiff; (b) appreciation or knowledge of the benefit;

4 and (c) that retention of the benefit would be unjust under the circumstances. *Alvarado v.*

5 *Microsoft Corp.*, No. C09-0189, 2010 WL 715455, at *4 (W.D. Wash. Feb. 22, 2010) (citing

6 *Bailie Commc'n, Ltd. v. Trend Bus. Sys. Inc.*, 61 Wn. App. 151, 160, 810 P.2d 12 (1991)).

7

       Defendant argues the "unjust element [of unjust enrichment] is lacking where the

8 defendant 'did not know and had no reason to know' it received an inequitable benefit," and that

9 that Plaintiff does not plead any facts "establishing Fred Meyer appreciated or knew of any

10 alleged benefit conferred or that it retained unjustly." Dkt. No. 18 at 20–21 (quoting *Cox v.*

11 *O'Brien*, 150 Wn. App. 24, 37–38, 206 P.3d 682 (Wash. Ct. App. 2009)). But Plaintiff alleges

12 that Fred Meyer's internal system showed both that it had attempted to issue refunds and that

13 certain of those attempted refunds had been rejected by his Direct Express Debit Card. *See* Dkt.

14 No. 14 ¶ 2.11. Further, Plaintiff informed Defendant of the benefit it was allegedly unjustly

15 retaining when he communicated with multiple Fred Meyer employees that he had not received

16 refunds to which he believes he was entitled. *Id.* ¶¶ 2.8–2.14. Finally, Plaintiff alleges that

17 Defendant's employees knew that other customers had complained to Fred Meyer about failing

18 to receive proper refunds to their debit cards after having prepaid for gasoline and not pumping

19 all of the gas for which they had paid. Id. ¶¶ 2.9, 2.10. Thus, Plaintiff has adequately alleged a

20 claim for unjust enrichment at this stage.

21

22

23 at 13. Defendant does not respond to this argument, thus appearing to concede the point. *See* Dkt. No. 20.
Regardless, as the Court has already determined that Plaintiff's claim for breach of contract survives on the basis of

24 his course of dealing and usage of trade arguments, it is not necessary to resolve Plaintiff's argument with respect to advertised pricing.

1    **4.    Washington Consumer Protection Act ("WCPA")**

2    To plead a claim under the WCPA, Plaintiff must allege "(1) an unfair or deceptive act or

3    practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a

4    person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wash.*, 166

5    Wn.2d 27, 37, 204 P.3d 885 (2009) (citing *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*,

6    105 Wn.2d 778, 784, 719 P.2d 531 (1986)). Private WCPA plaintiffs must establish all five

7    elements for their claim to survive a motion to dismiss. *See Hangman Ridge*, 105 Wn.2d at 793.

8    Defendant argues that Plaintiff has failed to adequately plead a WCPA claim because

9    Plaintiff has failed to allege deceptive or unfair conduct and because Plaintiff has not pleaded

10   any facts showing a public interest impact. Dkt. No. 18 at 21–24.  As Defendants only challenge

11   the first and third elements for establishing a WCPA claim, the Court only addresses those two

12   elements and treats Defendant's silence as a concession that Plaintiff satisfies the other elements.

13   **a.    *Unfair or Deceptive Conduct***

14   Under the WCPA, "unfair or deceptive acts or practices in the conduct of trade or

15   commerce" are unlawful. RCW 19.86.020. "By broadly prohibiting 'unfair or deceptive acts or

16   practices in the conduct of any trade or commerce,' the legislature intended to provide sufficient

17   flexibility to reach unfair or deceptive conduct that inventively evades regulation." *Panag*, 166

18   Wn.2d at 49 (quoting RCW 19.86.020).

19   **(1)    Unfair Conduct**

20   A practice is unfair if it "causes or is likely to cause substantial injury to consumers

21   which is not reasonably avoidable by consumers themselves and is not outweighed by

22   countervailing benefits [to consumers or to competition]." *Alpert v. Nationstar Mortg. LLC*, No.

23   C15-1164, 2019 WL 1200541, at *6 (W.D. Wash. Mar. 14, 2019) (quoting *Klem v. Wash. Mut.*

24   *Bank*, 176 Wn.2d 771, 786, 295 P.3d 1179 (2013) (alteration in original)). "The universe of

'unfair' business practices is broader than, and encompasses, the universe of 'deceptive' business practices." *Panag*, 166 Wn.2d at 51. A "practice is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits." *Klem*, 176 Wn.2d at 787 (quoting 15 U.S.C. § 45(n)). An injury is reasonably avoidable when consumers "have reason to anticipate the impending harm and the means to avoid it," or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168–69 (9th Cir. 2012) (citing *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365–66 (11th Cir. 1988)).

Plaintiff argues that he "and other customers had no reason to know or anticipate that Fred Meyer would not provide them the refunds that Fred Meyer owed and that it promised to furnish; that it may have made no effort to refund money for prepaid unpumped gas; or that Fred Meyer made no additional efforts to refund after any alleged unsuccessful refund attempt." Dkt. No. 19 at 22. Defendant argues that unfair conduct is limited to conduct which is "not reasonably avoidable by consumers themselves," and that Plaintiff's injury is entirely avoidable because he can control "how much gas to prepay for or how much to actually pump." Dkt. No. 20 at 12–13. The Court agrees.

The alleged unfair practice is reasonably avoidable. First, Plaintiff admits he specifically asked for refunds of the portion of his prepaid gas that he did not pump on multiple occasions— this shows Plaintiff's anticipation of possible impending harm by Defendant. *See, e.g.*, Dkt. No. 14 ¶ 2.5. Second, consumers can control both how much gas to prepay for as well as their ability to check their card statements to ensure that they received refunds for any gas not pumped. Indeed, when Plaintiff promptly checked his statement and found a discrepancy and raised it with Defendant, Fred Meyer refunded him the overpaid amount. Dkt. No. 14 ¶ 2.7. Therefore,

1   the Court finds Plaintiff has not sufficiently alleged unfair conduct and dismisses this theory of

2   Plaintiff's WCPA claim.

3                    **(2)**      **Deceptive Conduct**

4          Deceptive conduct exists "'if there is a representation, omission or practice that is likely

5   to mislead' a reasonable consumer." *Panag*, 166 Wn.2d at 50 (quoting *Sw. Sunsites, Inc. v. FTC*,

6   785 F.2d 1431, 1435 (9th Cir. 1986)). "While the [W]CPA does not define the term 'deceptive,'

7   the implicit understanding is that 'the actor misrepresented something of material importance.'"

8   *State v. CLA Estate Services, Inc.*, 23 Wn. App. 2d 279, 291, 515 P.3d 1012 (Wash. Ct. App.

9   2022) (quoting *State v. Kasier*, 161 Wn. App. 705, 719, 254 P.3d 850 (2011)). "A plaintiff need

10  not show the act in question was intended to deceive, only that it had the capacity to deceive a

11  substantial portion of the public." *Panag*, 166 Wn.2d at 47.

12         Plaintiff argues that "Fred Meyer's fuel cashiers told Mr. Shields the refunds he was

13  entitled to receive would be automatically credited back to his card, but they were not." Dkt. No.

14  19 at 21. Even if these statements were not intended to deceive Mr. Shields, Plaintiff argues, they

15  were "deceptive and had the capacity to deceive a substantial number of customers." *Id.* As

16  Defendant points out, Fred Meyer did attempt to automatically credit the cost of unpumped gas

17  back to Mr. Shields's Direct Express Debit Card—it is Direct Express that rejected the attempted

18  refund. *See* Dkt. No. 20 at 12.

19         However, Plaintiff also alleges that multiple of Defendant's employees knew that

20  Defendant did not always automatically refund debit cards for unpumped gasoline after

21  customers prepaid for more than they pumped. *See* Dkt. No. 14 ¶¶ 2.7–2.10, 2.13. In particular,

22  Plaintiff alleges that Defendant's employees represented to customers that they would receive

23  automatic refunds for the cost of unpumped gasoline, while knowing that Fred Meyer had

24  received numerous complaints from customers who had not received such refunds. *Id.* Accepting

these facts as true at the motion to dismiss stage, this is sufficient to establish that Defendant's

employees materially misrepresented to customers that they would be automatically refunded for

the cost of unpumped gas which, in turn, sufficiently alleges deceptive conduct for purposes of

Plaintiff's claim under the WCPA at this stage of the case. *See Nauman v. Gen. Motors LLC*, No.

C21-5150, 2021 WL 4502666 (W.D. Wash. Oct. 1, 2021) ("The Court has concluded that

Plaintiff has adequately alleged GM's knowledge of the oil consumption defect, which in turn

adequately alleges GM's unfair or deceptive conduct.").

### b. *Public Interest Impact*

Defendant contends that Plaintiff's allegations concerning other Direct Express

cardholders do not establish a public interest impact because he has not shown any alleged injury

to anyone other than those cardholders. Dkt. No. 18 at 23. Plaintiff contends that the relevant test

of whether a public interest impact exists is found at RCW 19.86.093(3). Dkt. No. 19 at 24.

RCW 19.86.093, enacted in 2009, clarified that a WCPA plaintiff may establish that an

alleged unfair or deceptive act or practice is injurious to the public interest because it:

> 1)  Violates a statute that incorporates this chapter;
> 2)  Violates a statute that contains a specific legislative declaration
>     of public interest impact; or
> 3)  (a) Injured other persons; (b) had the capacity to injure other
>     persons; or (c) has the capacity to injure other persons.

RCW 19.86.093; *see also Rush v. Blackburn*, 190 Wn. App. 945, 967–68, 361 P.3d 217 (Wash.

Ct. App. 2015). "The first two subsections of this statute reflect . . . that the public interest

element can be satisfied per se where the plaintiff shows violation of a statute that contains a

specific declaration of public interest impact." *Rush*, 190 Wn. App. at 968 (quoting *Klem*, 176

Wn.2d at 804 (Madsen, C.J., concurring)). "Subsection (3), by contrast, 'bases public interest

impact on actual injury and capacity to injure.'" *Id.* (quoting *Klem*, 176 Wn.2d at 804 (Madsen, C.J., concurring)).

For violations falling under subsection (3), Washington courts have continued to apply the *Hangman Ridge* factors to determine whether the public has an interest in any given action. *See id.*; *see also Nw. Prod. Design Gr.p, LLC v. Homax Prods., Inc.*, 174 Wn. App. 1002, 2013 WL 992666 (Wash. Ct. App. 2013) (applying *Hangman Ridge* test for public interest impact); *Rhodes v. Rains*, 195 Wn. App. 235, 247, 381 P.3d 58 (Wash. Ct. App. 2016) (same); *Zunum Aero, Inc. v. Boeing Co.*, No. C21-0896, 2022 WL 2116678 (W.D. Wash. June 13, 2022) (same). Where, as here, the transaction at issue is a consumer transaction, *Hangman Ridge* directs the Court to assess several factors relevant to establish public interest: "(1) Were the alleged acts committed in the course of defendant's business? (2) Are the acts part of a pattern or generalized course of conduct? (3) Were repeated acts committed prior to the act involving plaintiff? (4) Is there a real and substantial potential for repetition of defendant's conduct after the act involving plaintiff? (5) If the act complained of involved a single transaction, were many consumers affected or likely to be affected by it?" *Ride the Ducks Seattle LLC v. Ride the Ducks Int'l LLC*, 647 F. Supp. 3d 1049, 1057 (W.D. Wash. 2022) (quoting *Hangman Ridge*, 105 Wn.2d at 790).

Defendant only addresses the fifth factor—whether many consumers were affected by the act complained of (*see* Dkt. No. 18 at 23–24)—which the Court takes as a concession that Plaintiff meets the other factors. Therefore, the Court also focuses on the fifth factor. Defendant argues that *Stiegler v. Saldat* is instructive here. No. C14-1309, 2015 WL 13686087 (W.D. Wash. Oct. 23, 2015). *Stiegler* concluded that time-share holder plaintiffs had failed to establish public interest impact because they made "no allegations that anyone outside the club was impacted or is likely to be impacted by Defendants in the same or similar way." *Id.* at *3. And here, Defendant argues, "Mr. Shields has made no attempt to plead that anyone besides Direct

1    Express card holders were potentially injured. Indeed, he alleges that *only* Direct Express card

2    holders were injured." Dkt. No. 18 at 24. The Court disagrees with Defendant's characterization

3    of Plaintiff's allegations. To the contrary, Plaintiff alleges that other debit card users did not

4    receive refunds for gasoline for which they had prepaid but not pumped—not only Direct

5    Express debit card users. *See* Dkt. No. 14 ¶¶ 2.7–2.10, 2.13 (statements by Defendant's

6    employees that other debit card users had not received refunds for prepaid gasoline). And one of

7    the classes proposed by Plaintiff is "[a]ll persons who . . . did not pump the entire value of the

8    prepaid gasoline purchased and who did not receive a credit back to the debit card accounts used

9    to purchase the gasoline or who did not otherwise receive reimbursement for the value of the

10   unpumped prepaid gasoline." Dkt. No. 14 ¶ 8.2. This is broader than just Direct Express card

11   holders. Whether this proves accurate through discovery, as Plaintiff admits being told by one of

12   Defendant's employees that "the issue seemed to be a problem only with Direct Express debit

13   cards" (*id.* ¶ 2.10), is yet to be seen. But regardless, Plaintiff's allegations regarding Defendant's

14   employees' contradictory statements present a question of fact that at this stage is inappropriate

15   to resolve. *See Rush*, 190 Wn. App. at 972 (finding an issue of material fact regarding whether

16   defendant's conduct affected the public interest). At the motion to dismiss stage, Plaintiff's

17   allegations are enough to support his WCPA claim.

18          **5.    Imposition of Constructive Trust**

19          "A constructive trust is an equitable remedy that 'compels restoration, where one through

20   actual fraud, abuse of confidence reposed and accepted, or through other questionable means,

21   gains something for himself which, in equity and good conscience, he should not be permitted to

22   hold.'" *Shtikel*, 105 Wn. App. at 86–87 (quoting *Scymanski v. Dufault*, 80 Wn.2d 77, 88, 491

23   P.2d 1050 (1971)). Courts will typically impose constructive trusts in cases of "fraud,

24   misrepresentation, bad faith, or overreaching." *Id.* at 87 (quoting *Manning v. Mount St.*

*Michael's Seminary of Phil. & Sci.*, 78 Wn.2d 542, 546, 477 P.2d 635 (1970)). However, constructive trusts "arise independently of the intention of the parties, and may arise even though acquisition of the property is not wrongful." *Brooke v. Robinson*, 125 Wn. App. 253, 257, 104 P.3d 674 (Wash. Ct. App. 2004) (quoting *id.* at 87). "The primary purpose of a constructive trust is to prevent unjust enrichment." *Consulting Overseas Mgmt.*, 105 Wn. App. at 87.

The Parties dispute whether Plaintiff must make a showing of wrongdoing in order to establish a claim for the imposition of a constructive trust. *See* Dkt. Nos. 18 at 24, 19 at 26. While there must be "some element of wrongdoing" in order to impose a constructive trust, wrongdoing "is not confined to a particular category, such as fraud, misrepresentation, or bad faith." *Baker v. Leonard*, 120 Wn.2d 538, 548, 843 P.2d 1050 (1993) (first quoting *Peste v. Peste*, 1 Wn. App. 19, 23, 459 P.2d 70 (1969), then citing *Manning*, 78 Wn.2d at 546). "Equity's need for flexibility requires that wrongdoing not be so limited." *Id.*

Plaintiff here has pleaded wrongdoing on Defendant's part: the retention of money that should have been refunded to Plaintiff. *See* Dkt. No. 14 ¶¶ 2.8–2.14. Defendant asserts that "Fred Meyer gained nothing," but in the same sentence states that Mr. Shields left fuel that he may retrieve. Dkt. No. 20 at 14. This suggests that Fred Meyer did gain something: the fuel that Plaintiff paid for but did not take that Fred Meyer could then sell to another customer, thereby obtaining double payment for the same product. In any event, the Court has already determined that Plaintiff sufficiently pleaded that Defendant improperly retained the money Mr. Shields paid for unpumped gas. *See supra* Section III.B.3. For this reason, Mr. Shields has adequately stated a claim for imposition of a constructive trust.

**IV.**    CONCLUSION

Accordingly, Fred Meyer's Motion to Dismiss is DENIED.

Dated this 23rd day of July 2024.

_____

Tana Lin
United States District Judge